Marsden R. Leeder and Rose Leeder, his wife v. Commissioner.
Leeder v. Commissioner
Docket No. 49515.
United States Tax Court
T.C. Memo 1960-69; 1960 Tax Ct. Memo LEXIS 218; 19 T.C.M. (CCH) 352; T.C.M. (RIA) 60069; April 11, 1960
W. G. Ward, Esq., for the petitioners. Roger L. Davis, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies in income tax and additions to tax under section 291(a) of the Internal Revenue Code of 1939, for failure to file returns, and under section 294(d)(1)(A) of the said Code, for failure to file declarations of estimated tax, against the petitioners for the years 1950 and 1951, as follows: Additions to Tax
Sec.
Sec. 294
Year
Deficiency
291(a)
(d)(1)(A)
1950
$ 71,647.44
$17,911.86
$ 7,164.74
1951
286,918.00
71,729.50
28,691.80
*219 By amended answer, filed March 14, 1958, the respondent, for 1950, made claim for an increase of $71,926.58 in the income tax deficiency, or for a total deficiency for the year of $143,574.02, with claims for increases in the additions to tax of $17,981.65 under section 291(a) and of $7,192.66 under section 294(d)(1)(A). In the amended answer, he also made claim under section 294(d)(2) for an addition to tax of $8,614.44, for substantial underestimate of estimated tax, and under section 293(b), for an addition to tax for fraud of $71,787.01. For the year 1951, he made claim for an addition to tax under section 294(d)(2), for substantial underestimate of estimated tax, in the amount of $17,215.08, and for an addition to tax under section 293(b), for fraud, in the amount of $143,459. Pursuant to motion granted, the respondent on November 12, 1958, by a further amended answer, made claim for a total deficiency in income tax for the year 1950 in the amount of $223,807.64, which amount included the $71,647.44 originally determined and shown by the notice of deficiency. He also made claim for further increases in additions to tax of $20,058.40 under section 291(a), $8,023.36 under section *220 294(d)(1)(A), $4,814.02 under section 294(d)(2), and $40,116.81 under section 293(b). The questions are whether in the years 1950 and 1951 petitioners realized income from the production and sale of managanese ore from a mine located in Oriente Province, Cuba, known as Charco Redondo, and from the growing of sugar cane. With respect to the additions to tax, the questions are whether, without reasonable cause and due to willful neglect, petitioners failed to file income tax returns for the taxable years, whether they failed to file declarations of estimated tax for such years and substantially underestimated their estimated tax, under sections 294(d)(1)(A) and 294(d)(2) of the 1939 Code, and whether or not a part of the deficiency for each year was due to fraud with intent to evade tax, under section 293(b). Findings of Fact Some of the facts have been stipulated and are found as stipulated. Petitioners are husband and wife, and reside in Havana, Cuba. They are American citizens, but lived in Havana since 1925. Marsden R. Leeder, hereafter referred to as petitioner or Leeder, is an attorney, and during the period of his residence in Havana has been engaged in the practice *221 of law, with offices in the Bank of Nova Scotia Building in that city. Petitioners filed no Federal income tax returns for the years 1945 through 1948. For 1949, they filed a joint return on March 13, 1950, with the collector of internal revenue for the district of Florida at Jacksonville. The only income reported on the return was long-term capital gain from the sale of a residence in Miami Beach, Florida, in the amount of $6,496.58. Six exemptions were claimed and no taxable income was reported. They filed no income tax returns or declarations of estimated tax for the years 1950 and 1951. On January 15, 1953, petitioners filed a joint income tax return for 1952 with the director of internal revenue for Florida at Jacksonville. According to the return, $87,500 had been earned by Leeder as an attorney, and was shown as not taxable. A profit of $16,152.61 was reported from the sale of sugar cane, and long-term capital gain of $56,000 was reported on the sale of mining property in Cuba. It was reported that the property had been acquired on February 28, 1941, and sold on March 21, 1952. After application of claimed credits for taxes paid to Cuba, petitioners reported no tax due the *222 United States. The Charco Redondo, a managanese mine, is located near the town of Bayamo, in Oriente Province of Cuba, and approximately ten miles south of the railroad station of Santa Rita. In Cuba, the basic property rights in and to a mineral deposit are referred to as a denouncement. At some time prior to February 27, 1918, William Carleton acquired the Charco Redondo property, and it was recorded and registered in his name. Thereafter, under an instrument executed February 27, 1918, he sold an undivided half of the property to N. O. Pearce. In February of 1941, Leeder and Ruiz Williams formed a corporation, known as the National Manganese Mining Company, for the purpose of operating the Charco Redondo mine under an arrangement with Carleton and Pearce. The stock of the National Manganese Mining Company was owned 50 per cent by Leeder and 50 per cent by Williams. In October of 1941, Leeder bought the interest of Pearce in the mine and bought or purported to buy the interest of Carleton and thereafter dealt with the entire property as his own. The sale by Pearce to Leeder of his undivided interest in the property, as shown by "the instrument of Protocolozation, executed *223 on October 4, 1946," is of record with the Property Registry of Bayamo. In 1943, Williams having died in the meantime, the National Manganese Mining Company discontinued its operations, and Leeder began operation of the mine as a sole proprietorship. Among the employees at the mine, were Francisco Gutierrez and Daniel Saumell, both of whom continued to work at the mine after Leeder took over. Gutierrez was a technical man and the mine bookkeeper. At first, Saumell was employed as an office clerk, but in 1942 he became business manager of the mine. His salary at first was $55 per month, but by 1945 he was receiving $175 to $200 per month. Saumell and Gutierrez performed their duties under the direction of petitioner, receiving their instructions in person, over the telephone, by telegram, or by letter. Saumell bought the supplies necessary for the operation of the mine, dealt with contractors with respect to the mining of the ore, and supervised and kept records of the ore shipments. The actual mining and removing of the ore was done through independent contractors, and by individual tunnels. A contractor might contract for more than one tunnel, but usually there was one contractor *224 to a tunnel. For his work, the contractor was paid according to the quantity of ore removed, the rate per ton varying according to the managanese content of the ore. Each contractor employed the men who worked the tunnel under him, and paid them out of the payments received by him according to the ore extracted. As a rule, a tunnel was constructed by the contractor who was to operate it. The mining operation would furnish the contractor with the tools and materials required for the construction of the tunnel, including explosives, gasoline, electricity, tools, lumber, rails, pipes, cables, and the money required to pay his laborers. After a tunnel had been completed and the mining of ore began, a settlement would be made with the contractor each week, based on the quantity and grade of the ore produced, but from the payments due him 80 cents to $1.20 per ton was deducted as repayment for the cost of constructing the tunnel. A deduction of 12 1/2 cents per ton was made for the use of tools, air and electricity. A deduction was also made for taxes. The contractor was also charged for various of the supplies furnished to and used by him in his mining operations, such as dynamite, fuses *225 and carbide. The prices charged to the contractors for supplies were in excess of their cost and resulted in a profit thereon to the mining operation. In 1945, possibly in February, Leeder told Saumell to go to a hotel in Santiago and to take Gutierrez with him. They proceeded to Santiago as instructed and met with Leeder in his hotel room, at which time he stated that he had formed a corporation and had "appointed" Gutierrez as president and Saumell as vice president, treasurer and general manager of the company. He stated that he preferred to operate the mine in the future under a corporation name rather than his own. At Leeder's request, Gutierrez and Saumell signed various documents, which in form were designed to effect the formation of the corporation. The document dated February 12, 1945, was in the form of an agreement between Gutierrez and Saumell organizing a Cuban corporation under the name of Compania Minera Del Cautillo, Sociedad Anonima. Sociedad Anonima, usually abbreviated as S.A., means Anonymous Society, and is supposed to indicate a fictitious entity apart from its stockholders. The document stated that the English name of Cautillo Mining Company might be used. *226 Gutierrez and Saumell were not only shown to be the organizers, but to be the only stockholders of the company. The capital was stated as $5,000, represented by 50 shares of $100 par value stock, and it was further stated that Gutierrez and Saumell had each paid in cash the respective amounts of $2,500. Neither Saumell nor Gutierrez invested any money in any such company. About two weeks later, Leeder brought to Gutierrez and Saumell two provisional stock certificates made out one in the name of each, indicating an ownership of 25 shares of stock. They were requested to endorse the certificates, which they did, in blank or to bearer, and handed them back to petitioner. Saumell never saw either of the certificates at any time thereafter. After these occurrences, Gutierrez and Saumell continued to work in the same manner as they had prior thereto. The document of February 12, 1945, which had been signed by Gutierrez and Saumell, was registered with the Registrar of Corporations of Oriente Province and with the Mercantile Registrar of Bayamo. The document of February 12, 1945, was, in so far as the words and form were concerned, sufficient under Cuban law to evidence the formation of *227 a corporation. Under Cuban law, the minute book of a newly formed corporation is opened by a notary public who on the First Page is required to certify that he has officially opened the book which is to carry the official minutes of the corporation. The certification specifies the number of pages in the book and that the notary has placed his seal on each page. A minute book in the name of the Cautillo Mining Company was opened by a notary public of Bayamo. It contained two hundred consecutively numbered blank pages, and his seal was stamped on each page. Cuban law requires that a corporation maintain a stock registry book, in which the secretary is to record all transfers of stock. The minute book in the name of the Cautillo Mining Company shows Rogelio Sandrino as secretary. Sandrino is a lawyer in Havana, and an acquaintance of petitioner for many years. At the time he became secretary and for some years thereafter, his office was nearby, if not actually in the suite of offices occupied by petitioner. Luis Deschapelles has been engaged in or connected with the mining business since 1939. He met petitioner in 1941, when he was employed by the Tennessee Products Company of *228 Nashville, Tennessee, the name of which was later changed to Ore & Ferro Corporation. In 1944 he was employed by the Ore & Ferro Corporation at Santiago, Cuba, as supervisor of the ore purchased by that company from petitioner. Early in 1946, an arrangement was made between petitioner and the Ore & Ferro Corporation which eliminated the need for Deschapelles' services with respect to such purchases. Whereupon, petitioner approached Deschapelles about working for the Charco Redondo mine in the supervising of the extraction of the ore. He offered Deschapelles no salary, but as compensation agreed to give him the concession for a commissary. He also agreed to give him a contract for working one or two tunnels in the mine. Deschapelles accepted the offer, and began his activities at the mine early in 1946. The commissary was similar to a general store that sold foodstuffs, shoes and all types of merchandise to workers. Deschapelles did not have the funds with which to start the commissary, and petitioner advanced three checks of $3,000 each, which entire amount was used to stock the commissary. In addition to operating the commissary and supervising the extraction of ore, Deschapelles *229 assisted Saumell in the performance of some of his duties. Deschapelles lived on the property, first in a room back of the commissary and then in a house built for him. He resided there rent free. It was not until 1949 that he got a tunnel, the said tunnel being referred to as K-10. He operated the tunnel through a foreman who supervised the work. He was to have received another tunnel which was being constructed, but it was not completed until 1951, when the operation was under control of a receiver. Gutierrez died on or before May 22, 1946, shortly after Deschapelles had come to the mine. After Gutierrez' death the books were first kept by Raphael Martinez, sent by petitioner from Havana. By 1950, he had had two successors. Shortly after the death of Gutierrez, Leeder asked Deschapelles to be temporary president of Cautillo Mining Company, until someone else was found for the position. He was not offered nor did he receive any payment for such service. Saumell's position and duties were not changed and Deschapelles continued in his original position of assisting Saumell, running the commissary and later operating Tunnel K-10. Both continued to take their instructions from *230 petitioner. Early in 1949, petitioner acquired the concession for a chrome ore mine at Punta Gorda near Moa, which is located on the coast in an isolated part of eastern Cuba. Deschapelles operated the mine until early in 1950, when the ore was exhausted. Petitioner had purported to organize the Moa Chrome Mining Company, naming Deschapelles as president. Petitioner furnished the money for operating the mine. Deschapelles received none of the proceeds from the sales of the ore which were made by petitioner. He did not know the price for which the ore was sold, or what petitioner received from the sales. He kept records of the ore produced, the money received from petitioner and its disbursement. After the chrome ore was exhausted Deschapelles returned to the Charco Redondo mine. He had in the interval made some trips between the two mines. He sent to petitioner the records, checks stubs and other papers pertaining to the chrome mining operation. During 1949, after working for a few months at the chrome mine, Deschapelles asked petitioner for additional compensation for the services he was rendering. Petitioner offered to give him 5 per cent of the profits of Charco Redondo when *231 it should produce profits. He received no payments pursuant to the promise, and during 1950 he again talked to petitioner about additional pay. Petitioner stated there had been insufficient profits, and offered Deschapelles the stock of the Cautillo Mining Company as security for payment of 5 per cent of the profits at the end of the year. He displayed to Deschapelles two certificates, each for 25 shares of stock, and turned them over to him. One certificate had Saumell's signature on the back, and the other had been similarly endorsed by Gutierrez. No other names appeared on the certificates. Deschapelles had never seen any of the Cautillo stock prior to receiving these certificates. He placed them in the office safe at Charco Redondo, where they remained until the mine was taken over by a receiver, as hereinafter set forth. He never saw the certificates again, and he was not paid the promised 5 per cent of the profits at the end of 1950. According to the Cautillo Mining Company minute book, beginning with February 15, 1945, and through April 30, 1952, thirteen stockholders meetings were held. Gutierrez and Saumell were shown as the stockholders who attended the first three meetings, *232 and Deschapelles and Saumell as the stockholders attending meetings 4 through 12. Sandrino was shown as having been in attendance at all meetings, and as having kept the minutes. As shown by the minute book, the 13th meeting was held on April 30, 1952, and the individuals shown as the stockholders in attendance were Sandrino, representing 25 shares, and Oscar Astudillo, representing 25 shares. All meetings were shown as having taken place in Havana, the place of the first meeting being shown as the "law office" of Sandrino and that of the others as 404 Bank of Nova Scotia Building. Room 404 is variously shown as being one of the rooms in the office suite of petitioner between 1941 and 1952. According to the minutes of the first purported meeting of stockholders, on February 15, 1945, two proposals were made and approved, the first being that for a period which would terminate December 31, 1948, Leeder be expressly authorized to sell and ship all ore in his name, in the name of Cautillo Mining Company, or in any other name, and to collect and receive the value of the same and sign receipts or quitclaims and any other documents that might be necessary or convenient in the name of the *233 Cautillo Mining Company, and that he be given a royalty of $3.10 per dry ton for each and every ton of manganese delivered, "it being understood that said royalty covers all royalties, mine denouncements, surface right and all other services of Dr. Leeder." The second proposal was that "Leeder receive some $1.00 per dry ton of manganese from the 'Charco Redondo' mine to be paid * * * Oscar Astudillo * * * for use of machinery at the 'Charco Redondo' mine, said machinery being necessary and used at 'Charco Redondo' in the exploitation, said Company not having the necessary machinery." [1]
According to the minutes *234 of the second purported meeting, on January 19, 1946, Gutierrez proposed that Leeder be convinced that the company could not pay the $3.10 per dry ton of ore mined, as agreed, and that an effort be made to convince him of the necessity that he accept payment of not more than $1 per ton. The minutes of the purported meeting of February 20, 1946, record Gutierrez as reporting that Leeder had agreed to reduction of his royalty from $3.10 per ton to a maximum of $2 per ton, and if the company should be unable to pay $2 a ton, he agreed to a lower payment, never less than $1 per ton; and in the event of failure of the company to meet the $1 payment, the company should owe Leeder at the $1 per ton rate any amount not paid. He is also recorded as reporting that Leeder would "opportunely sign the contract containing the aforementioned modifications." Minutes No. 5, relating to a purported meeting on January 9, 1947, record Deschapelles as reporting that on December 30, 1946, a contract with Leeder had been signed, modifying royalty payments, and further record Deschapelles as having delivered to the secretary a copy of the contract. [2]
*235 Neither Saumell nor Deschapelles ever attended any meeting, or any of the purported meetings, of stockholders of Cautillo Mining Company. Beginning with minutes No. 3, covering the purported meeting of February 20, 1946, but which minutes do not show him in attendance, Deschapelles signed all of the minutes of the purported meetings through minutes No. 12 of the purported meeting of April 24, 1952. He did such signing at the request of petitioner and in petitioner's office. In the latter part of 1949 or early part of 1950. Leeder sent Oscar Astudillo to Charco Redondo, to assist Saumell in the mining operations. He assisted Saumell for a few months in 1950, and then left. He had nothing to do with the office or financial management of the operation. Saumell knew of no ownership or claim of ownership, by Astudillo of any trucks or equipment at the mine and used in the mining operations. He never paid Astudillo any amount to cover the use of any trucks or equipment. Deschapelles had seen Astudillo when he was assisting Saumell at the mine in 1950 and knew of the work he was doing, but he had no knowledge of any ownership, or claim of ownership, by Astudillo of any trucks or machinery *236 used at the mine. The ore mined at Charco Redondo was delivered to the mouth of a tunnel by the tunnel contractor and dumped on the ground. After samples had been taken and the manganese content determined, it was shoveled on to trucks by laborers who worked for a loading contractor, the contractor being paid 21 cents per wet ton for each such ton loaded. The ore was then hauled to Santa Rita, where it was transferred to gondolas or other railroad cars, or if no cars were available the ore was dumped on the ground, until cars were provided. Due to a second handling of some of the ore, the loading costs for ore at Santa Rita were higher than at the mine, the average cost at Santa Rita being 31 cents per wet ton. The truck drivers were paid 33 cents per wet ton for each ton of ore hauled to the railroad. The payments made to the tunnel contractors for mining and delivering the ore to the mouth of the tunnel were at the following rates: Payment per
Manganese Content
Long Wet Ton
40 to 42.99 Per Cent
$4.90
43 to 43.99 Per Cent
5.40
44 Per Cent and Up
5.90
Other expenses of the mining operation included the cost of materials and supplies, such as water pipes, *237 rails for the tunnel tracks, wire cables and lumber. The mine had its own electric plant and paid the cost of its maintenance and operation. It had no telephone, and when Deschapelles or Saumell telephoned Leeder from Bayamo, the cost of the calls was reversed. During the rainy season the mine might be flooded, bringing on added costs. Such costs included the expense of pumping the water from the tunnels which were flooded and the cost of repairs which had been made necessary by the flooding. In some instances it was necessary to repair or replace crossities. There was some considerable flooding during 1949, but comparatively little during 1950. Included in the equipment belonging to the mining operations were a number of trucks used in transporting the ore to the railroad at Santa Rita. In respect of these trucks, $1 per wet ton of ore hauled was entered on the books kept at the mines to cover truck expenses. At $1 per wet ton, the trucks usually showed a profit, If it was necessary to hire trucks the rental cost was $1 per wet ton of ore hauled. In addition to the truck drivers and the tunnel and loading contractors, who were paid on a per ton basis, the mine had a staff of *238 employees who were directly paid on a wage or salary basis, consisting of those engaged in managerial activities, a scaleman, chemists, carpenters, blacksmiths, road workers, and other laborers. The compensation for these employees, including Saumell and Deschapelles, was somewhere between $1,000 and $1,500 per week. The tunnel contractors, the loading contractors and all other employees and workers at the mine were paid weekly. Saumell would make an estimate of the money needed to cover the weekly payroll and other costs, including the amounts which would be due tunnel and loading contractors. Based on these estimates, either Saumell or Deschapelles would advise Leeder, by telephone or wire, as to the amount of money that would be needed. Leeder would then supply the money required either by check or in cash. On some occasions Saumell or Deschapelles got the checks when in Havana. When the money was received by check, the checks were usually drawn on the personal bank account which Leeder had with the Santiago Branch of the Bank of Nova Scotia. On one occasion in 1950, when Leeder was making a trip to Europe, he gave Deschapelles a check dated August 3, 1950, for $40,000, to cover *239 the mining expenses during his absence. This check, which was delivered to Deschapelles in Havana, was drawn on Banco Garrigo of that city. It was cashed by Deschapelles at the bank, and the proceeds were delivered by him to Saumell at the mine. After the loading of the ore on the railroad cars at Santa Rita all further costs not borne by the purchasers of the ore were paid by Leeder. None of these costs were paid by or through Saumell or Deschapelles. For use in paying the operating costs at the mine, Leeder had authorized the opening of a bank account with Banco Continental Americano in Bayamo in the name of Cautillo Mining Company. The deposits made in this account were, with very few exceptions, checks received from Leeder to cover the mining expenses. The checks drawn on the account were payable on the joint signature of Saumell and Deschapelles. Leeder had no authority to make withdrawals. During 1950, the bank account was not regularly used. During that year Leeder usually sent or brought cash to the mine. Leeder paid the railroad freight on the ore from Santa Rita to Santiago where the ore was delivered to and stored in a bonded warehouse. Warehouse receipts covering *240 the ore were issued in the name of Cautillo Mining Company but were delivered to Leeder. Leeder made all sales of the ore and received payment therefor, and dealt with the money received as his own. At the direction of Leeder, Saumell prepared and sent to Leeder in Havana a cost sheet for each day of mining operations. These sheets purported to show the tons of ore produced, both in terms of wet tons and dry tons, and the cost thereof, and the tons of ore shipped in terms of dry tons. The costs for the day were segregated and listed under Wages; Supplies; Royalties; Rail Freight; Hauling; Loading Expense; Purchases and Repairs; and Overhead. Included in wages were the amounts paid to tunnel contractors for the production of ore and wages paid to the mine personnel, but the amounts paid to the loading contractors were included separately under the heading Loading Expense. Similarly, the 33 cents per ton paid to truck drivers was included in Hauling expense. The costs reflected by these sheets, in numerous respects, did not represent actual costs of the mining operations. The amounts shown under the heading Royalties did not represent amounts paid to the owners of the surface land; *241 nor did they represent an amount paid by Saumell or Deschapelles to anyone. These amounts, which in early 1949 were listed at 75 cents for each dry ton of ore produced, were later increased to amounts in excess of $2 per ton. They were included by Saumell in the cost sheets on Leeder's instructions. Overhead at the rate of $1 per dry ton of ore produced likewise represented an amount listed as cost, by reason of instructions from Leeder. They did not represent any overhead expense at the mine, or any amounts expended or paid out by Saumell or Deschapelles. Similarly, under instructions from Leeder, Saumell, under the heading Loading Expense, included $2 per ton, which was not expended. [3] Another departure from the listing of actual costs had to do with supplies furnished to the tunnel contractors, for which credit was taken in making the weekly settlements with the said contractors for the ore produced. In arriving at the amount of credit or reimbursement, the supplies were charged to the tunnel contractors at prices exceeding their cost to the mining operation. *242 The surface land where the openings of various of the Charco Redondo tunnels were located belonged to several different individuals or families. Among the owners were Nicasio Rosales, an individual by the name of Estrada, and the Carulla family. Leeder had no fixed contract with any of these landowners, but would make small payments of $100 and less to them, from time to time. In one or more instances, Leeder purchased the surface lands in question, one such purchase being that of the land belonging to the Carulla family. The payments made by Leeder to the owners of the surface land were made directly by him, and were not reflected on the daily cost sheets prepared by Saumell and sent to Leeder in Havana. The electric plant, machinery, houses, laboratory, and the area for parking trucks and storing the equipment were located on the Dos Hermanos and Cautillo farms, titles to which farms were acquired by Leeder by purchase in 1942. The area known as the Cautillo farm was purchased from the Carulla family. During 1950 petitioner, at intervals, purchased manganese ore from Martin Caparros, which ore had been produced from a mine located in the same general area of Oriente Province *243 as the Charco Redondo mine. The ore was shipped to Santiago from the station of Baire. Leeder would pay the freight on the ore shipments, but in making his settlements with Caparros on the ore purchases, would take credit for amounts shown on the settlement statements as the freight so paid. In making final settlement for 568.28 wet tons of ore shipped from August 4, 1950, to October 25, 1950, petitioner also took credit for $1,200, described as a discount. During 1950 petitioner made payments to Caparros, all by check, as follows: Date
Amount
January 20
$ 1,500.00
February 14
1,700.00
March 10
3,159.43
April 3
2,100.00
April 21
3,000.00
May 4
1,950.73
May 23
1,000.00
June 7
2,000.00
July 1
2,000.00
July 20
2,000.00
August 1
5,346.49
August 10
3,000.00
September 1
5,000.00
October 26
1,932.36
November 10
3,000.00
December 1
2,943.96
December 15
5,000.00
Total
$46,632.97
All of the above checks, except the check for $1,500, dated January 20, 1950, which was drawn on petitioner's account at Banco Popular at Bayamo, were drawn on his account at the Santiago Branch of the Bank of Nova Scotia. Under date of January 15, 1951, petitioner *244 issued a further check against his account at the Santiago Branch of the Bank of Nova Scotia and in favor of Caparros for $2,447.48. The shipments of ore from Charco Redondo to Santiago during 1950 amounted to 55,588.95 wet tons. The average grade of ore so shipped was 42.75 per cent. According to the records of the Cuban Railroad, the ore was shipped in the name of Cautillo Mining Company, but all payments for transporting the ore were made by Leeder. The total charges incurred by Leeder for transportation of ore to Santiago in 1950 amounted to $119.058.55. [4] During 1950 and for transportation of ore to Santiago, Leeder actually paid $115,838.85 to the Cuban Railroad, the payments for the most part being made near the first of each month. Included in this amount was a payment of $5,629.58 on January 2. Under date of January 10, 1951, a further payment of $9,561.70 was made. *245 After all 1950 shipments of Charco Redondo ore had been made to Santiago, there were 66.03 tons on freight cars and 267.03 tons on the ground at Santa Rita. During World War II and up to December 31, 1944, the United States Government, with the cooperation of the Cuban government, controlled all purchases of ore through a Metals Agency, which had been set up. In September of 1944, Leeder was notified that after December 31 of that year producers of manganese ore could sell directly to private industry in the United States. Ore & Ferro Corporation had been receiving Charco Redondo ore, and after 1944 it became a direct purchaser. Another purchaser, at least as early as 1946, was Sloss-Sheffield Steel & Iron Company of Birmingham, Alabama. During 1950, all ore sales were made to three customers, the two companies mentioned and Union Carbide & Carbon Corporation, also a United States business concern. The sales to Union Carbide were made through an agent, William H. Muller & Company of New York City. Each of the above companies "opened" letters of credit in the name of M. R. Leeder with the Santiago Branch of the Bank of Nova Scotia. When a sale of ore had been negotiated, Leeder *246 would endorse the warehouse receipts covering the ore theretofore issued in the name of Cautillo Mining Company, and would deliver them to the bank, which in turn would credit his personal bank account with the amount authorized by the pertinent letter of credit. In some, if not all, instances the credit so authorized was expressed as so many dollars per ton of ore. Generally, the amount credited in respect of a given shipment would approximate 80 per cent of the price finally determined and paid. The total amount to be paid was determined and the final payment was made when the ore was received by the purchaser and had been weighed and analyzed. Settlement in the usual case was approximately 90 days after the ore was shipped from the mine and within 30 days after shipment from Santiago. According to the waybills, bills of lading and invoices, the shipper of the ore was shown as Cautillo Mining Company, but on final settlement of a sale of ore, payment of the balance due would be by check made payable to Leeder. He did not deposit these checks in his Santiago bank account. During 1949 and 1950, Leeder made sales of manganese ore as follows: 1949
Long Wet Tons of Ore
% Manganese Content
Gross Sales
40-42.99%
43-43.99%
44% Up
Price of Ore
Sloss-Sheffield
5,765.58
2,577.01
10,638.12
$ 405,968.67
Ore & Ferro
3,186.38
4,215.11
8,491.18
352,342.72
8,951.96
6,792.12
19,129.30
$ 758,311.39
1950
Sloss-Sheffield
12,132.01
6,545.54
373,797.10
Ore & Ferro
13,988.52
3,769.81
1,566.60
401,834.02
Union Carbide
14,253.71
430,372.92
40,374.24
10,315.35
1,566.60
$1,206,004.04
*247 All sales of ore to Sloss-Sheffield and to Ore & Ferro were f.o.b. Santiago. On these sales the purchasers paid the storage and loading costs. The sales to Union Carbide were f.o.b. Norfolk, Virginia, and f.o.b. Baltimore, Maryland, in respect of which Leeder expended $80,506.68 for transportation expenses, $499.50 as chemical analysis fees, and $7,739.98 in commissions to W. H. Muller & Company as agent. In selling manganese ore, petitioner, from time to time, advanced substantial sums on behalf of the purchasers, for which he was later reimbursed. During 1950, the total reimbursements so made to him by the purchasers of ore in respect of such advances amounted to $125,612.07. Leeder did not account to Saumell or Deschapelles personally, or as stockholders or officers of Cautillo Mining Company, for the ore sales, and no record was ever made on the Cautillo Mining Company books as kept by them covering such sales. Beyond the fact that they knew of the quantity of ore shipped from Santa Rita to Santiago, and their understanding that the ore was being sold in the United States, they knew nothing of the sales which were in fact made, and were not advised as to the amount of sales *248 proceeds or the disposition thereof. In connection with the preparation of the Cuban income tax returns, however, Leeder would instruct Saumell to enter on the Cautillo Mining Company books a specified lump-sum amount as gross receipts. This amount wauld be so reported on the Cuban income tax return. Saumell would enter whatever amount Leeder told him to enter. [5]
In September of 1946, Francisco Dellunde, an attorney purporting to represent the Estate of William Carleton, requested Leeder to give an accounting of his administration of the Charco Redondo denouncement from and after 1941. Leeder represented to the attorney that he had purchased Carleton's interest in the mine; that a small balance remained to be paid, and upon the execution, by and for *249 the estate, of the notarial deed, the balance due would be paid. On January 13, 1947, Ada Jane Carleton, as executrix of the Estate of William Carleton, her deceased husband, instituted suit against Leeder in the Court of First Instance of the South District of Havana, demanding possession of the mine and an accounting Leeder filed an answer, and in turn brought suit against the estate for execution of the notarial deed of sale and for an acceptance of "the $1550.00 pending," which amount he deposited with the court. The two suits were consolidated, and on January 31, 1949, the court entered its opinion, the effect of which was the upholding of Leeder's claims. An appeal was taken to the Audiencia de la Habana, which on March 28, 1950, affirmed the lower court. An appeal was thereafter taken to the Cuban Supreme Court, and a hearing was set for November 28, 1950, which hearing was postponed to June 8, 1951. On or about December 5, 1950, Ada Jane Carleton sold whatever interest she had in the Charco Redondo mine to Compania de Construcciones Cajigas, S.A., referred to hereafter as Cajigas, S.A. According to the instrument of sale, as recorded in the Central Corporations Registry and *250 in the First Mercantile Registry of Havana, and which is of record with the Property Registry of Bayamo, the consideration for the sale was $149,000, of which $50,000 was in legal currency and $99,000 in the form of 990 shares of preferred stock of Cajigas, S.A., having a par value of $100 per share. On January 9, 1951, Cajigas, S.A. filed an action in the civil court of Bayamo, requesting that the Charco Redondo mine be placed in receivership. The court ordered the receivership, and appointed a judicial administrator, who immediately took possession of the mine. Leeder, upon being informed of the action taken, proceeded to Bayamo, where he entered a plea that the action be annulled. The documents offered to support the plea were declared to be ineffective, and the plea was denied. Leeder then recused the judge of the court and lodged a criminal complaint against him with the Supreme Court of Cuba. Leeder thereafter had Deschapelles come to his office in Havana, explaining that his lawyer could see no way of getting the mine back other than by request for possession in the name of Cautillo Mining Company, and that this request had to be based on a contract between him, Leeder, *251 and Cautillo. Leeder showed Deschapelles a contract, which Deschapelles signed on Leeder's request. The contract was dated December 30, 1946, but was signed by both petitioner and Deschapelles in 1951, probably in April. At the same time, Deschapelles, at the request of Leeder, also signed the minute book, wherein, on some undisclosed date, minutes were inserted [6] to show a purported stockholders' meeting on January 9, 1947, at which Deschapelles purportedly reported that on December 30, 1946, a contract with Leeder had been signed modifying royalty payments to be made by Cautillo to Leeder. Subsequently, and on the basis of the purported contract of December 30, 1946, petitioner caused Deschapelles to institute an action in a court in Santiago, in the name of Cautillo Mining Company, requesting possession of the mine. The court ruled that the purported contract was not valid, and denied the request. Also at the request of petitioner, Deschapelles, in the name of Cautillo, instituted criminal proceedings against *252 the representatives of Cajigas, S.A. and against the first administrator. Saumell and Deschapelles were in Bayamo on the day the judicial administrator was appointed and heard that the mine was to be taken over by him. They returned to the mine and before the administrator got to the safe Saumell took from the safe $8,000, of which he retained $2,000 for the payment of salaries to himself and other employees and turned the balance over to Leeder when Leeder later came to the mine. Rafael Manrique, the first administrator appointed, served for about 3 1/2 months and then resigned. Between January 9 and March 16 he directed operations of the mine. Effective March 16, 1951, he leased the mine to Compania Minera Guama, S.A., of Bayamo, for a royalty of $4.50 per wet ton of ore mined, $4 being for the ore removed and 50 cents for the use of the mining equipment. On April 4, 1951, he made a report to the court covering the administration of his receivership through March 31. For that period, he accounted to the court for profits of $130,000, after paying operating costs and reserving money as operating funds. Of the $130,000, he reported that $15,982 represented the royalty on 3,551 *253 tons of ore produced by the lessee during the last fifteen days of March. He attached to his report a statement showing sales, accounts, salaries and the resulting profit. He delivered to the court two checks for $65,000 each, one to Leeder and the other to Cajigas, S.A., representing equal distribution to them of the $130,000. On April 7, 1951, Leeder accepted delivery from the clerk of the court of the check made out to him. He received the check under protest, declaring his reservation of such rights of civil and criminal actions to which he might be entitled. On May 4, 1951, Manrique submitted his resignation as judicial administrator and his report covering the results of his administration of the mine from January 9 to April 30, 1951. In this his final report, he reported profits for the full period of his administration of $239,371.45, which he stated were "delivered in cash to the co-owners." At the same time, he delivered a check drawn to the order of "Marsden Robert Leeder" in the amount of $56,750, stating that a check in the same amount had already been delivered to Cajigas, S.A. This second check was delivered to Leeder by the clerk of the court on May 9, 1951, with Leeder *254 making a declaration that the judicial administration was irregular and illegal and reserving all rights to himself as he had done when receiving the $65,000 check on April 7. [7]
In his final report, Manrique noted the retention of a balance of $1,584.70 "under the title of 'Gallery K-10,' which corresponds to the benefits obtained by the ownership through the discovery made by me regarding the fact that Mr. Deschapelles is not a contractor, and that he was being paid as such improperly." [8] He further stated in his report "that according to the data I have had in my possession said mine has produced profits only in the sum of two thousand pesos, more or less, during the last six years which shows a considerable increase" and the "production has been increased *255 to almost eight thousand tons per month, and through the improvements that are being made by Compania Minera Guama, S.A., the present lessee, in which it is spending large amounts, production will soon be very much greater." Ramon Bustillo was appointed judicial administrator to succeed Manrique as of May 1, 1951. He filed a report for each month thereafter through January of 1952, in which he reported the monthly production of ore, the royalties received, the disbursements made and the amounts paid to the "co-owners," as follows: Disbursements
Royalties
Adminis-
Received
trator's
Report
Tons
Month
at $4.50
Stamp
Commis-
Total Paid
Date
Produced
Produced
per ton
Cost
sion
Co-owners
6/12/51
9,103.31
May
$ 40,964.90
$ 24
$ 500
$ 40,440.90
7/ 5/51
9,599.11
June
43,196.00
24
3,000
40,172.00
8/16/51
10,661.43
July
47,976.44
24
7,500
40,452.44
9/12/51
12,060.48
August
54,272.16
60
7,400
46,812.16
11/ 6/51
11,237.66
September
50,569.47
60
5,000
45,509.47
11/ 6/51
13,529.73
October
60,883.79
60
6,000
54,823.79
12/12/51
11,361.04
November
51,124.68
60
7,000
44,064.68
1/ 8/52
11,899.30
December
53,546.85
60
5,000
48,486.85
2/ 8/52
15,134.38
January
68,104.71
60
6,500
61,544.71
Totals
104,586.44
$470,639.00 $432
$47,900
$422,307.00
*256 The nine checks issued by Bustillo in the name of petitioner were in a total amount of $211,153.51, and were turned over by Bustillo to the court. Petitioner received the checks from the clerk of the court under protest, reserving any rights he might have. He received the four checks covering May, June, July and August operations on September 29, 1951, the checks covering September and October operations on December 8, 1951, and the checks covering November and December operations on January 8, 1952. The check covering the operations of January 1952 was received on February 29, 1952. In all, he received from the two administrators a total of $332,903.51, of which $277,887.62 was received by or was available to him in 1951. The balance of $55,015.79 was available to and received by him in 1952. Petitioner rendered no personal services with respect to the mine's operation during the period of receivership. He did not account to Saumell or Deschapelles personally, or as stockholders or officers of Cautillo Mining Company, for the royalties so received. There is no record of a dividend having ever been declared or paid by Cautillo Mining Company. On December 31, 1948, the petitioner's *257 account at the Santiago Branch of the Bank of Nova Scotia was overdrawn by $39,496.53. During 1949, the credits to the account were in the total sum of $757,335.48, and at December 30, 1949, it was overdrawn by $1,050.33. During 1950, the account was credited in the total sum of $1,225,351.35. On December 30, 1950, it was overdrawn by $8,540.29. During 1951, the account was credited in a total amount of $222,784.06. On December 31, 1951, it was overdrawn by $160.69. Of the $222,784.06 credited to the account during 1951, $204,230 was made up of four deposits of $100,000 on January 31, $18,080.40 on February 7, $31,149.60 on March 20, and $55,000 on April 16. The remaining $18,554.06 credited to the account during 1951 was spread between nine deposits, from May 7 to December 8, and ranging in amounts from a high of $5,000 on May 31, to a low of $300 on December 3. With respect to certain listed checks drawn on the petitioner's bank account at the Santiago Branch of the Bank of Nova Scotia, amounting in the aggregate to $521,694.12 in 1949, $251,657.95 in 1950 and $26,229.80 in 1951, it is stipulated that all checks issued to the Cautillo Mining Company were either deposited in the *258 bank account of Cautillo Mining Company in the Banco Continental Americano, or were delivered to Deschapelles or Saumell; that all checks issued to the Cuba Railroad Company were payments for freight charges on ore produced from the Charco Redondo mine; that all checks issued to Explosivo Millares were payments for explosives used in mining operations at Charco Redondo; that all checks issued to Banco Popular were deposited to the account of Marsden R. Leeder in Banco Popular; that all checks issued to Deschapelles or Saumell were delivered to them for use in paying expenses of the mine; and that the amounts represented by the remaining checks are deductible as business expenses in connection with the production of ore from Charco Redondo. Of the listed checks for 1949, the checks drawn to petitioner's account in Banco Popular amounted to $259,500, leaving $262,194.12 as the aggregate of the amounts of checks drawn to other payees. Of the checks representing the latter amount, checks in a total amount of $161,519.95 were issued to Cautillo Mining Company, leaving $100,674.17 as the total of the checks issued to Cuba Railroad Company, Explosivo Millares, and others. Of the listed *259 checks drawn in 1950, checks in the aggregate amount of $34,000 were drawn in favor of Banco Popular, leaving $217,657.95 as the aggregate of the checks drawn to other payees. Of that amount, $14,500 represented three checks drawn to Cautillo Mining Company, leaving $203,157.95 as the total of the checks drawn to others. On none of the listed or stipulated checks for 1951 was Banco Popular or Cautillo Mining Company shown as payee. One check for $400, dated December 12, 1949, and another check for $750, dated January 9, 1950, were shown as payable to Banco Popular, Baracoa. Baracoa is shown by the may in evidence as being across the island from Santiago and in the Moa area, where petitioner's chrome mining operations were conducted in 1949 and the early part of 1950. All other checks issued to Banco Popular were deposited in petitioner's account in Banco Popular at Bayamo. The stipulated checks drawn in 1951 against petitioner's bank account with the Santiago Branch of the Bank of Nova Scotia, in the total amount of $26,229.80, were twenty-two in number, and ranged in dates from January 10 to December 17. Two of the checks, one dated January 10 for $9,561.70 and another dated January *260 23 for $6,555.76, were issued to the Cuba Railroad Company. Three checks, one dated January 29 for $2,200, one dated February 16 for $1,000 and one dated March 2 for $1,000, were issued to Explosivo Millares. Five checks, one dated August 3 for $1,000, one dated October 19 for $500, one dated November 9 for $600, one dated November 14 for $400 and one dated December 5 for $1,000, were issued to Daniel Saumell. Three checks, one dated August 16 for $600, one dated November 14 for $200 and a third dated December 17 for $1,000, were issued to Deschapelles. Four checks, all for $55 each and dated September 12, October 19, November 14 and December 5, were issued in the name of Nicasio Rosales. The remaining five checks were to different payees, and were comparatively small in amount. With respect to certain listed checks drawn on petitioner's bank account with Banco Popular at Bayamo, and amounting in the aggregate to $227,356.68 in 1949, $39,627.20 in 1950 and $775.46 for 1951, it is stipulated that all checks issued to Cautillo Mining Company were either deposited to the bank account of the Cautillo Mining Company in Banco Continental Americano, or were delivered to Deschapelles or *261 Saumell, and that the amount represented by the remaining checks is deductible as business expenses in connection with the production of ore at the Charco Redondo mine. Of the listed checks drawn on the account at Banco Popular in 1949, checks in the total amount of $195,039.29 were drawn in the name of Cautillo Mining Company, leaving $32,317.39 as representing the checks drawn in other names. For 1950, only six checks are listed, of which five checks, in a total amount of $35,500, were drawn in the name of Cautillo Mining Company, leaving $4,127.20 as the aggregate amount of the checks drawn in other names. Only one check, in the amount of $775.46, is listed for 1951. This check was issued in the name of Deschapelles. For the most part, the above checks drawn on the two bank accounts in favor of Cautillo Mining Company ranged from $5,000 to $8,500, and during 1949 averaged about one check per week on the two banks, the checks for the first five months and two checks drawn in June being drawn on the bank account at Santiago, and the rest of the checks being drawn on the account at the Banco Popular. At or about the same dates as shown on the checks, deposits were made in corresponding *262 amounts in the Cautillo Mining Company account at Banco Continental Americano. During 1950, only three of the above checks which were drawn on the Santiago bank account were in favor of Cautillo Mining Company. A check dated February 10, for $7,500, and a check dated August 3, for $6,000, appear to have been deposited at or about the dates of the checks in the bank account of Cautillo Mining Company. A check dated December 1, for $1,000, does not appear to have been so deposited. Only six of the stipulated checks drawn on the Banco Popular account were drawn in 1950. Five of these, all drawn in January, were drawn in favor of Cautillo Mining Company. Two were for $6,000 each, one for $6,500, and two for $8,500 each. The Cautillo Mining Company account at Banco Continental Americano shows deposits on or about the dates of the checks in amounts corresponding to the amounts of the checks. On December 31, 1948, the balance in the account of Cautillo Mining Company with Banco Continental Americano was $1,910.79. During 1949 there were total deposits of $379,041.49 to the account, plus other credits in correction of banking errors in a total amount of $5,369.55. At December 31, 1949, the *263 account had a balance of $1,142.15. Total deposits to the account during 1950 amounted to $72,387.22, the last deposit being a deposit of $210, on September 15. The balance at the end of September was $58.76, after which a withdrawal of $10 was made on October 24, 1950, leaving a balance of $48.76. [9]
The deposits to the Cautillo Mining Company account with Banco Continental Americano in 1949 were substantially all at or about the dates and in the amounts of checks drawn on petitioner's bank account at the Santiago Branch of the Bank of Nova Scotia and on his account with Banco Popular at Bayamo. Of the total deposits to the Cautillo Mining Company bank account in 1949, $161,500 represented twenty-three checks on petitioner's bank account at the Santiago Branch of the Bank of Nova Scotia, drawn under dates of January 8 through June 3, inclusive, and $195,039.29 represented twenty-nine checks drawn on petitioner's bank account at Banco Popular, under dates ranging from June 17 to December 30, inclusive. Of the total deposits to the Cautillo Mining *264 Company bank account in 1950, $35,500 represented five checks on petitioner's Banco Popular bank account, all drawn in January, and $13,500 represented two checks on petitioner's bank account at the Santiago Branch of the Bank of Nova Scotia, one dated February 10, for $7,500, and the other dated August 3, for $6,000. The remaining deposits were eighteen in number, amounting in the aggregate to $23,387.22. They ranged in amount from $100 to $8,500, the sources of the funds making up these deposits not being shown. During 1950, eleven additional checks in a total amount of $407,000 were drawn on petitioner's bank account at the Santiago Branch of the Bank of Nova Scotia in the name of the Cautillo Mining Company. [10] One dated March 29, for $25,000, and another dated May 3, for $50,000, show the endorsement "Cautillo Mining Co. - Luis Deschapelles, President, D. Saumell, Vice Pres.-Treas." One dated February 15, for $40,000, and another dated June 5, for $35,000, show the same endorsement, followed by the further endorsement "M. R. Leeder." The remaining seven checks did not bear the endorsement of Deschapelles or Saumell either as officers of Cautillo Mining Company or as individuals. *265 They were endorsed merely "Cautillo Mining Co.," followed by "M. R. Leeder." The dates and amounts of these seven checks were as follows: May 16, 1950
$ 7,000
June 16, 1950
65,000
July 19, 1950
30,000
August 9, 1950
35,000
August 18, 1950
30,000
September 21, 1950
30,000
September 28, 1950
60,000
Total
$257,000
During 1950, four checks were issued against petitioner's bank account at the Santiago Branch of the Bank of Nova Scotia in the name of M. R. Leeder, and were shown as cashed on or about the dates they were issued, under the endorsement "M. R. Leeder." [11] The dates and amounts of those four checks were as follows: March 3, 1950
$25,000
March 10, 1950
56,000
April 18, 1950
2,000
April 26, 1950
16,000
Total
$99,000
During *266 1951, three checks were drawn on petitioner's bank account with the Santiago Branch of the Bank of Nova Scotia showing Cautillo Mining Company as payee. One such check for $40,000, although bearing date of January 10, 1950, was shown as cashed on January 15, 1951. This check was endorsed "Cautillo Mining Company," followed by "M. R. Leeder." The other two checks, one dated July 1 and the other September 12, each for $1,000, were endorsed "Cautillo Mining Company - Luis Deschapelles, Pres., D. Saumell, Vice Pres. - Treas." One check, drawn on the account in 1951, was a certified check due January 11, 1951, for $50,000, showing M. R. Leeder as payee. This check was cashed on January 31, 1951. bearing only the endorsement "M. R. Leeder." A second check, dated April 12, 1951, for $50,000, was also made payable to M. R. Leeder. It was cashed April 19, 1951, bearing only the endorsement "M. R. Leeder." By check, petitioner, at intervals during 1950, made seventeen payments, ranging in amounts from $440.78 to $7,205.11 and in a total amount of $70,913.46, to Cia Operadora de Muelles y Almacenes, S.A. The payee of these checks was a warehouse company in Santiago operating a warehouse or *267 warehouses in which ore was generally stored. The first of the checks, which was dated January 13, 1950, and was in the amount of $5,160.33, was drawn on petitioner's account with the Bank of Nova Scotia in Havana. The remaining sixteen checks [12] were all drawn on his account at the Santiago Branch of the Bank of Nova Scotia. From February 17, 1950, to June 20 of the same year, inclusive, petitioner, by check, made nine payments in a total amount of $42,071.28 to Federico Causo. [13] One of these checks, dated April 25, 1950, for $568.29, was drawn on petitioner's bank account at the Santiago Branch of the Bank of Nova Scotia. The other checks were drawn on his bank account with the Bank of Nova Scotia in Havana. Under date of June 8, 1950, petitioner issued a check for $9,181.25 in the name of A. J. Martinez, Inc. [13]
*268 In addition to his accounts at the Santiago Branch of the Bank of Nova Scotia, Banco Popular at Bayamo and Banco Garrigo in Havana, petitioner also had accounts with Banco Agricola y Mercantil and Banco Popular, both in Havana, and Miami Beach First National Bank, Miami Beach, Florida. He also used freely as his own a bank account in the names of "Robert Henry Leeder and/or Rose Leeder," with the Bank of Nova Scotia in New York City. Robert Henry Leeder was petitioner's father. With the said bank, there was on file a power of attorney executed by R. H. Leeder, which authorized petitioner to make deposits and withdrawals and to issue checks upon the account. A signature card of petitioner was on file. The address given on both the signature card of petitioner and of his father was petitioner's office in the Bank of Nova Scotia Building in Havana, although the ledger sheets of the account covering the period November 4, 1948, to October 29, 1952, show the address of Robert H. Leeder and/or Mrs. Rose Leeder as Santiago, Cuba. During 1949, there were only three deposits, in a total amount of $15,907.54, in the New York City Bank of Nova Scotia account. The largest of the three deposits *269 was $10,660.31, made on May 5, by O. Nunez, who was petitioner's secretary. The balance in the account at December 31, 1949, was $1,135.97. During 1950, twenty-one deposits, in a total amount of $494,088.49, were made in the account. The sources of eight of these deposits, the last of which was made on August 15, were Sloss-Sheffield, Ore & Ferro and Muller & Company, the total of the eight deposits being $84,483.44. Seven other deposits were shown as having been made by petitioner, O. Nunez, or upon the "advice of Leeder and Ruiz." The last of these deposits, which was made by Leeder on August 22, consisted of $87,000 in cash and $2,596.66 in checks. The largest deposit was in cash and in the amount of $200,000. It was made on November 20, and according to the deposit slip, Rose Leeder was the depositor. Two deposits of cash, one for $12,000 and one for $69,000, were made on September 26, the depositor or depositors being unidentified. A small deposit was made on November 15 by Nunez, and there was a bank credit, based on two unidentified checks, in a total amount of $15,031.49, on September 25. During 1950, there were twenty-six debits to the account in a total amount of $313,173.65, *270 leaving a credit balance in the account at December 31, 1950, of $182,050.81. Of the total debits, seven of the withdrawals, ranging from $10,000 to $100,000 and in a total amount of $274,000, were made from August 9 to December 6, both inclusive. During 1951, there were eleven deposits in the account in a total amount of $916,975. Five of these deposits were in the total amount of $613,000, were in cash and were shown by the deposit slips as having been made by petitioner. A deposit of $45,000 on November 9 represented the transfer of that amount from petitioner's account with the Miami Beach First National Bank. Of the remaining five deposits, there were three deposits in cash, of $12,000, $97,000 and $90,000, with the depositor or depositors not being identified on the deposit slips. The other two deposits, one on March 5 for $9,975 and the other on November 23 for $50,000, were described as bank credits, with the source of the funds not being identified by the deposit slips. During 1951, there were sixty-eight debits to the account in a total amount of $1,117,341.27, leaving a debit balance of $18,315.46 reflected by the ledger sheets as of December 31, 1951. Twenty-eight of *271 the sixty-eight debits ranged in amounts from $10,000 to $123,000, and were in a total amount of $986,611.55. Three of these debits were for $100,000 and one was for $123,000. The $123,000 debit and another for $11,663.65 represented withdrawals by checks which had been certified. The bank account at the Miami Beach First National Bank was opened August 25, 1941, as "M. R. Leeder or R. H. Leeder." In so far as appears, all deposit tickets to the account were made in the name of M. R. Leeder. During 1949 and up to the middle of September 1950, most of the funds deposited in the account were from Sloss-Sheffield, Ore & Ferro and W. H. Muller & Company, and ranged in amounts from a few hundred dollars up to $28,459.22. Such deposits were made with considerable regularity, with one or more of such deposits in each month. After September 12, 1950, there was a deposit on December 6, of $8,496.72, from Sloss-Sheffield; $3,814.29 on December 28, from Ore & Ferro; $6,608.74 on February 7, 1951, from Ore & Ferro, and $12,159.26 on March 21, 1951, from Ore & Ferro. A deposit of $1,500 in currency was made on October 4, 1950, one of $56,000 was made on October 16, 1950, and a third of $22,000 *272 was made on November 29, 1950. A cash deposit was made by Leeder in the account on March 7, 1951, in the amount of $116,500. In November and December of 1951, deposits of $50,000, $50,000, $38,500, $30,000 and $10,000 in cash were made in the account. During 1950, the total of the deposits to the account which were in cash amounted to $79,500. In 1951, the cash deposits were in the total amount of $295,000. The balance in the account at January 1, 1949, was $991.87; at January 1, 1950, $35,460.47; at January 1, 1951, $33,192.01; and at December 31, 1951, $14,767.10. By written instrument, dated March 28, 1952, petitioner sold all of his interests in Charco Redondo mine and certain other properties to Cajigas, S.A. As shown by the instrument, the settlement price was $560,000, "divided" as follows [14]: $ 40,000
as compensation for expenses
incurred by Leeder in regard to
"Compania Minera Guama, S.A."
and the Judicial Administrators,
during the period of the judicial
management of the Charco Re-
dondo mine to date and the
cession of his rights and actions
to claim anything from said
company or them;
125,000
as Leeder's professional fees;
100,000
for Leeder's rights in the Charco
Redondo and Secundo Charco
Redondo mines;
20,000
for Leeder's rights in the La
Casualidad mine;
100,000
for the electric plant and ma-
chinery;
100,000
for all the houses Leeder owned
on the farms sold;
50,000
for trucks, utensils and chattels;
10,000
for Leeder's rights in the Cau-
tillo farm;
10,000
for the "Dos Hermanos" farm.
*273 The instrument also recited that Leeder had received the sum of $25,000 in "legal currency." It further recited that the buyer would pay the balance of $535,000 in eight consecutive monthly payments, the first seven being for $70,000 each, and the last one for $45,000. The first payment was to be made on January 3, 1953, and the other payments were to be made on the third day of each month following, the last payment to be made on July 3, 1953. There was to be no interest if the payments were made when due, but if the payments were not made on the dates specified, they were to bear interest at 6 per cent per annum until payment was made. When the mine was taken over by the administrator in January of 1951, there were approximately 6,307 tons of ore on the dock at Santiago awaiting shipment. It was attached by order of the court, which order provided that the ore be conserved until the litigation should be terminated. In the meantime, Leeder had obtained an advance from the bank on the ore, but after its seizure by *274 the court, the bank demanded return of the advance. Sloss-Sheffield desired to acquire the ore which had been so seized by the administrator, and an effort was made to make it appear as the owner. On March 7, 1951, Leeder, on the stationery of Leeder and Ruiz, Attorneys at Law, wrote Sloss-Sheffield as follows: "Relative our telephone conversation of this forenoon, I am pleased to hand you herewith my check No. 315-A, of this date, on The Miami BeachFirst National Bank, to the order of your good Company, for the sum of $126,149.60. "Will appreciate that upon cashing this check you ask your Bank to notify the Santiago de Cuba Branch of The Bank of Nova Scotia to pay to the Cautillo Mining Company the sum of $126,149.60 upon delivery to them of warehouse receipts Nos. 115, 116, 117, 118 and 119, supporting 6307.48 tons of managanese at the docks in Santiago de Cuba, which payment is at the rate of $20.00 per ton as per contract. The bank upon receipt of these certificates may deliver same, without responsibility on their part, to either Mr. Luis Deschapelles or Dr. M. R. Leeder, inclusive transmitting title. "Wish to thank you for your cooperation and hope that ere long we can *275 advise you that the ore has been liberated and we are ready to make shipments to you." The $126,149.60 so transmitted to Sloss-Sheffield was repaid to Leeder through the Manufacturers Trust Company of New York and the Santiago Branch of the Bank of Nova Scotia. On March 15, 1951, Sloss-Sheffield instructed the Manufacturers Trust Company to instruct the Bank of Nova Scotia, Santiago, to pay the sum of $126,149.60 to the Cautillo Mining Company, upon delivery to the bank by Cautillo of the dock receipts for the said ore, as shown in Leeder's letter of March 7; that these receipts represented an aggregate of 6,307.48 gross tons of manganese ore, and that the Bank of Nova Scotia might deliver the receipts, properly endorsed, to either Leeder or Deschapelles without payment of funds. Pursuant to this letter, the said sum was repaid to Leeder, and on March 16, 1951, Leeder signed a receipt in which he acknowledged he had received from the Santiago Branch of the Bank of Nova Scotia the warehouse receipts covering the said 6,307.48 tons of ore. The ore was still on the dock in Santiago when Leeder sold his interest in the Charco Redondo mine to the Cajigas interests. In the course of *276 his ownership and operation of Charco Redondo, Leeder expended $128,200 for the electric plant and machinery, $150,000 for houses and buildings and $50,000 for trucks, accessories and equipment, [15] all of which were included in the sale of the Charco Redondo mine in 1952. Deschapelles first learned of the sale of the Charco Redondo mine through one of the interested parties in Cajigas, S.A. He then went to Leeder to discuss and reach an agreement as to amounts he considered owing to him by Leeder. His claims were based upon (1) his ownership or interest in the commissary, its inventory and equipment; (2) amounts due him as contractor for Tunnel K-10 from the beginning of the receivership to the sale of the mine; and (3) compensation for services rendered to Leeder in the management of the chrome mining operation and in connection with the operation of Charco *277 Redondo. In settlement of these claims, Deschapelles received three checks, two for $15,000 each and one for $10,000. He attributed the two $15,000 checks to the first two claims enumerated, and the $10,000 check to the third. Saumell, upon hearing of the sale of the Charco Redondo mine, was of the view that he was entitled to additional compensation for the ten to twelve years of service he had rendered Leeder, and asked Leeder for a bonus of $25,000. Leeder, in return, paid Saumell $3,000. In 1952, Saumell received additional amounts up to $500, and in 1956 or 1957, he received an additional $100 from Leeder. On August 20, 1952, Leeder appeared at the airport in Havana, for the purpose of traveling, by plane, to the United States. He was questioned by a Cuban revenue official as to the amount of money he was taking from Cuba, and signed a declaration, under oath, that he was carrying with him only 50 pesos. Upon inspection, a handbag he had tried to leave at the airline traffic counter was found to contain $149,000 in currency. After the search of the handbag, a second bag or container which had been checked by Leeder and had been placed on the plane, was also searched and was *278 found to contain $720,000. The money was in United States currency, and was made up of five, ten and twenty dollar bills. The money was seized and deposited with the Cuban Treasury Department, Leeder being advised that a tax of 2 per cent was required, and that in failing to declare the money and pay the tax, he was "defrauding the Cuban tax laws." Leeder had carried large sums of money from Cuba on other occasions. Leeder at all times during the taxable years was the owner of at least 50 per cent, if not the whole, of the mining denouncement called Charco Redondo. During 1950, and up to the taking over of the mine by the administrator in 1951, the operation of the mine was Leeder's individual enterprise, the profits were substantial, and all profits realized and received from that operation were realized and received by him as his own. The payments received by him during 1951 from the first administrator and from the successor administrator represented one-half of the net profits from the mine from January 9 to the end of the year, and were his income. In 1950, and as a sugar cane planter, Leeder delivered for grinding 1,095,244 arrobas of sugar cane, receiving in settlement *279 therefor $92,288.23. Similarly, in 1951 he had ground and disposed of 1,254,471 arrobas of sugar cane for $100,851.63, on which his profits amounted to $11,591.46. In his 1952 return, and on 1,630,683 arrobas of sugar cane, for which his settlement was $112,127.39, he reported $16,152.61 as his profit from the sale of the said sugar cane. For the year 1950 Leeder realized from the mining and sale of manganese ore and from sugar cane a net profit of at least $137,585.43. For the fiscal year ending September 30, 1950, Leeder reported taxable income to the Cuban Government of $14,924.83, and paid income tax thereon of $703.36. On January 5, 1953, the Cuban Treasury determined a deficiency in income tax of $23,606.54, which Leeder paid on January 6, 1953. According to the computation, the deficiency resulted from the inclusion of additional income from fees in the amount of $87,500 and unreported commissions of $10,125. For the fiscal year ended September 30, 1951, Leeder reported income to the Cuban Government of $18,287.88, and paid income tax thereon of $1,160.90. On January 3, 1953, a deficiency in tax was determined against him in the amount of $22,104.33, which Leeder paid *280 on January 6, 1953. The basis for the deficiency determined was unreported fees of $74,525, commissions of $13,850 and a profit of $462.47 from the sale of molasses. Prior to November 1951, the Cuban peso was at par with the American dollar. On and after November 1, 1951, there was an export tax on the conversion of pesos into American currency, and if the conversion was handled in the United States, there would be a loss or an expense amounting to a total of 2.125 per cent. The deficiency or part of the deficiency in income tax for each of the taxable years 1950 and 1951 was due to fraud with intent to evade tax. Petitioners' failure to file income tax returns for 1950 and 1951 was due to willful neglect, and not to reasonable cause. For 1950 and 1951, petitioners, without reasonable cause, failed to file declarations of estimated tax. Leeder was indicted by a Federal grand jury in Miami, Florida, for felony on two counts, charging him with the filing of false and fraudulent income tax returns for the years 1949 and 1952. At about the same time, an action was begun against him in Baltimore, Maryland, on two misdemeanor counts, for failing to file income tax returns for the *281 years 1950 and 1951. The charges for all years were consolidated for one trial, which was begun in the United States District Court for the Southern District of Florida, Miami Division, without a jury, on February 5, 1957, and continued through February 14, 1957. Before conclusion of the trial and submission of the case, Leeder was permitted to withdraw his plea of not guilty to the misdemeanor charge and enter a plea of nolo contendere, the Government's objection to the acceptance of the latter plea being overruled. The court then declared Leeder guilty on the misdemeanor counts, after which the Government moved to dismiss the felony counts, which motion was granted by the court. A fine of $5,000 on each misdemeanor count was imposed and Leeder was sentenced to imprisonment for six months. The imprisonment sentence was suspended, and Leeder was put on probation for a term of two years. One of the conditions of the probation was that Leeder cooperate with the tax authorities so as to bring about an early settlement of his tax problems and make payment of any tax found to be due. Leeder was allowed to leave the jurisdiction of the court and return to Cuba, on the condition that he report *282 to the probation officer in Miami once every three months. Opinion In the case of an individual citizen of the United States, who is a bona fide resident of a foreign country during the entire taxable year, section 116(a) of the Internal Revenue Code of 1939[16] provides that earned income received from sources without the United States shall be exempt from United States income tax. In subsection (3) of the said section, earned income is defined as meaning "wages, salaries, professional fees, and other amounts received as compensation for personal services actually rendered." And in the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income producing factors, a reasonable allowance not in excess of 20 per cent of the taxpayer's share of the net profits is to be regarded as earned income. *283 The petitioners are both citizens of the United States, but since 1925 have resided in Havana, Cuba, where Leeder is and has been engaged in the practice of law. It is their contention that in the taxable years their income other than earned income from sources without the United States was not in amount sufficient to result in any income tax from them, or to require the filing of returns. It is the position of the petitioners that the income from the production and sale of manganese ore from the Charco Redondo mine was the income of Cautillo Mining Company, a Cuban corporation; that the income from the growing of sugar cane was that of Matanzas Land & Trust Company, also a Cuban corporation, and that no part of the income from either venture was that of Marsden R. Leeder. With respect to the production and sale of manganese ore, it is their position, in the alternative, that even if the operation of the Charco Redondo mine be held to be that of Leeder and not that of a separate corporate entity, the cost of producing and selling the ore was such that no profit was realized. To sustain their contentions, the petitioners rely particularly on the testimony of Leeder himself, to *284 the effect that from and after February 12, 1945, the manganese mining operation was that of Cautillo Mining Company, a duly organized and existing Cuban corporation; that Leeder's participation in the operation was solely that of sales agent for the corporation, for which he was to receive a commission of at least $1 per ton of ore sold; that not only was he never paid the amount of commissions due and owing to him for his services as such sales agent, but that he regularly advanced his own funds to the corporation to enable it to meet its operating expenses, a substantial portion of which advances were never repaid. As evidencing the formation and existence of Cautillo Mining Company as a valid and subsisting Cuban corporation, they cite the document of February 12, 1945, and the minutes kept by Sandrino of purported meetings of Cautillo Mining Company stockholders. In respects essential to the case of the petitioners, the testimony of Saumell and Deschapelles stands in direct contradiction not only of the testimony of Leeder, but of the documentary evidence tending to show that the operations of the Charco Redondo mine was that of Cautillo Mining Company, a Cuban corporation, *285 of which they were the stockholders, and that the operation was not that of petitioner. We heard the testimony of petitioner and that of Saumell and Deschapelles. We observed them while they were testifying, and have read and studied the transcript of their testimony, together with other evidence of record. And we are satisfied and convinced that no one who with any objectivity heard and observed the witnesses as we did, would or could, in reason, have concluded that the relation of Saumell and Deschapelles to the Charco Redondo mining operation was anything more than that of employees or representatives of Leeder. We are also satisfied and convinced that to the extent that the Cautillo Mining Company minutes indicate otherwise, they were pure fabrication. Also, we are satisfied and convinced that Saumell and Gutierrez, in signing the document of February 12, 1945, which listed them as organizers of a Cuban corporation to be known as Cautillo Mining Company and as owners of the stock therein, were doing so as employees of Leeder, and not as principals. The document of February 12, 1945, made no mention of the Charco Redondo mine, and does not reflect the ownership by the corporation *286 therein purported to be organized of any interest in the mine or in its operations. And aside from a purported contract bearing date of December 30, 1946, discussed hereafter, there is no showing of record of any instrument of grant or lease whereby and whereunder Cautillo Mining Company acquired any rights in or to petitioner's Charco Redondo denouncement. And whatever may be the effect of the document of February 12, 1945, under Cuban law, as evidence of the organization of a corporation, we are not in doubt, on the record before us, that with respect to Charco Redondo, Cautillo Mining Company was nothing more than a name used to some extent in the operation of the mine by Leeder individually and in his selling of the ore therefrom. What we have said above with respect to the testimony of Saumell and Deschapelles and with respect to the minutes of purported meetings of stockholders of Cautillo Mining Company reflects our convictions, on the evidence of record, as to the untrustworthiness of the testimony of Sandrino given at the criminal trial of the petitioner and made a part of the record in this case. As corroborating his testimony in various respects, and as supporting his *287 position, the petitioner also relies on Oscar Astudillo, who testified in both the criminal trial and the trial herein. According to the minutes of the first purported meeting of Cautillo Mining Company stockholders, which meeting, according to the minutes, was attended by Saumell and Gutierrez, Leeder was to receive $1 per dry ton of manganese ore produced from the Charco Redondo mine, to be paid to Astudillo for the use of machinery at the mine. At the criminal trial, it was the testimony of Astudillo that the leasing of the equipment to Cautillo was by oral contract made with Saumell; that the rental price for the trucks went from $1 to $2 per ton and that the rental price for the use of compressors fluctuated between $1.50 and $2 per ton; and that Saumell was the one who paid him the rent. The time of the leasing was fixed at some time in the year 1948 or 1949, "before or thereabouts." Astudillo also testified at the criminal trial that in 1952 or thereabouts he negotiated the purchase of the outstanding stock of the Cautillo Mining Company from Deschapelles for $1,000, and that he paid the $1,000 to Deschapelles. At the trial herein, it was Astudillo's testimony that the contract *288 covering the leasing of certain machinery and trucks belonging to him was in writing, and that it was entered into with Gutierrez, although he later had some oral "agreements" with Saumell. It was his further testimony that in 1945 he had very slight relations with Saumell, but beginning in 1946, he acted in a supervisory capacity to Saumell at Charco Redondo; that he was technical adviser, for the purpose of obtaining greater production at the mine; that he left Charco Redondo in 1948, and that he did not return to Charco Redondo after November 15, 1948. With respect to his purchase of Cautillo stock, he testified that he acquired the Deschapelles stock through Sandrino, but did not fix any cost therefor. It was the testimony of Saumell that he never attended the purported stockholders' meeting of February 15, 1945, the minutes of which recited the leasing of machinery from Astudillo, or any other meeting purporting to be a meeting of the stockholders of Cautillo Mining Company; that he first met Astudillo when in the latter part of 1949 or early 1950 Astudillo was sent to Charco Redondo by Leeder to assist Saumell in the mine operation, and that Astudillo assisted him for a few *289 months into 1950 and then left. It was Saumell's further testimony that he knew of no ownership, or claim of ownership, by Astudillo of any trucks or equipment at the mine and used in the mining operations, and that he never paid any amounts to Astudillo as rent on trucks or other equipment. It was the testimony of Deschapelles that he had seen Astudillo at the mine in 1950, when he, Astudillo, was assisting Saumell, but that he had no knowledge of any ownership, or claim of ownership, by Astudillo of any trucks or machinery at the mine. With respect to the Cautillo stock, Deschapelles testified that he had in his possession for a short time the two stock certificates, one in the name of Gutierrez and one in the name of Saumell, as security for the payment to him by Leeder of a percentage of the profits from the mine; that he placed the certificates in the safe at the mine, and never saw them thereafter. As between the testimony of Saumell and Deschapelles and that of Astudillo, we are satisfied that Saumell and Deschapelles and not Astudillo were telling the truth. We listened to the testimony of Astudillo given at the trial herein, and observed him while he was testifying. We *290 are convinced that his testimony, in substantial part, was pure fabrication, and we are unable to regard it as representative of the truth in respects where it is not corroborated by credible evidence. The petitioner further relies on the document bearing date of December 30, 1946, purporting to be a contract between him and Cautillo Mining Company. The document recites that by private contract executed the 15th day of February, 1945, Leeder, as sole owner and possessor of the manganese mine Charco Redondo, contracted with Cautillo for the exploitation of the said mine; that Cautillo would proceed as therefore with the exploitation in the mining of manganese mineral from Charco Redondo and would "remit" the ore mined to Santiago, or any other port, at the free disposition of Leeder; that Leeder would advance, as "theretofore," amounts necessary for payment of payroll, materials and machinery, and would pay railroad freight from Santa Rita to Santiago, or any other port or place, and costs for unloading and loading aboard ships, as well as marine freight and insurance; that at the end of December of every year thereafter a liquidation of accounts would be made, with Leeder taking *291 a maximum of $2 per ton of ore sold and remitting the balance of the ore sales proceeds to Cautillo as profits during the year. It was Leeder's testimony that settlements were thereafter made between him and Saumell and Deschapelles, as officers of Cautillo, pursuant to the said writing dated December 30, 1946, and that the said settlements were made on the basis of records maintained by him at his office relating to the mining operations, the advancements and the sale of ore, and the records kept by Cautillo at the mine. There is of record no contract or document dated February 15, 1945, whereby Leeder granted, or purported to grant, to Cautillo mining rights to the Charco Redondo mine and the improvements thereon, and except for the reference in the document of December 30, 1946, and in the self-serving declarations of Leeder, and possibly the testimony of Sandrino, we have found of record no reference to or suggestion of the existence of any such contract or document. Referring further to the provisions of the document of December 30, 1946, it was the testimony of Saumell and Deschapelles that not only did they personally or as officers of Cautillo have nothing to do with the *292 sale of the ore mined, but that the ore at all times was regarded by them as belonging to Leeder; that they had no knowledge of the details of the sales of the ore or the amounts received on such sales, and at no time did Leeder ever account to them, individually or as officers of Cautillo, for such ore sales proceeds. For the purposes of the Cuban income tax returns, whatever figure Leeder supplied as representing ore sales or gross income was used without question. As to the document of December 30, 1946, itself, it was the testimony of Deschapelles that it was executed in 1951, after the mine and mining properties had been taken over by order of the court at Bayamo, and that the purpose was that such a contract would supply a basis for Leeder's recovery of the property in court. We are not in doubt that the operation, as well as the ownership, of the Charco Redondo mine was and continued to be that of Leeder individually, and not that of a corporation; that at no time did Saumell and Deschapelles, either directly or as stockholders of a corporation, have any proprietary interest in the operation, but at all times were acting as employees and representatives of Leeder; or that *293 the documents in question were never intended to be what on their face they purported to be. Moline Properties, Inc. v. Commissioner, 319 U.S. 436, and other similar cases cited and relied on by petitioners, and wherein it was held that the corporate entity of a valid and subsisting corporation may not be disregarded so as to tax corporate income to the stockholders, are distinguishable on their facts, and are not controlling here. We accordingly conclude and hold that any and all profits realized from the ownership and operation of the mine and the sales of the ore produced therefrom prior to the receivership in 1951 were the profits of Leeder. We are also of the view and hold that the 1951 payments received from and made available to him by the two court administrators were likewise his income. It is the contention of the petitioners that there were no profits from the operation in 1950, and with respect to 1951, that Leeder received the payments from the administrators under protest and for the benefit of Cautillo Mining Company, and that any and all such payments as were received by him in 1951 were expended in satisfaction of obligations of Cautillo Mining Company, *294 a corporation, or were otherwise accounted for to or for the benefit of that corporation. According to the evidence, respondent's attention was directed to Leeder in 1952 because of a newspaper article giving an account of Leeder's detention in Havana, Cuba, when, with some $869,000 in American currency, he appeared at the airport in Havana for the purpose of traveling by plane to the United States. As a result of that article, a special agent with the Intelligence Division of the Internal Revenue Service was assigned in November of 1952 to determine whether Leeder "had filed returns commensurate with the possession of such large amounts of money." The agent first met Leeder on January 8, 1953, when, at the agent's request, Leeder came to the office of the Internal Revenue Service in Miami, Florida. In the course of the interview which followed, Leeder advised the agent that the only return filed by him had been for 1949, in which year he had sold a residence in Miami Beach, Florida; that he was a practicing lawyer in Havana, Cuba, and was under the impression that income earned for professional services by an American citizen residing abroad was not taxable; that he was aware, however, *295 that if profits were made in a business venture or from the sale of assets, a return would have to be made showing the income therefrom; that while residing in Cuba, he had operated a manganese mine and a sugar cane plantation, from which he never made any profit, but in fact had incurred a loss; and that if the agent came to Cuba, he would make available to him all of his canceled checks, his bank statements and any records or accounts pertaining to the operation of his interests in both the mining and sugar cane ventures. The evidence further shows that the agent called on Leeder in Havana on January 14, 1953, at which time Leeder submitted the bank statements and canceled checks on his account in Miami Beach for the years 1950 and 1951, but when asked for other records, advised the agent that he had no records of the mining operations, as they were kept at the mine and had been seized at the direction of the magistrate. On that occasion and on a later occasion or occasions, the agent did receive from Leeder and his secretary some further records relating to the shipment of manganese ore, various canceled checks and some records of sugar cane sales purported to have been made by *296 Leeder. Thereafter, and as a result of the investigation made by the special agent, the respondent determined that Leeder in 1950 had realized net taxable income of $137,585.43, which, after the allowance of $1,000 as a standard deduction, resulted in a deficiency in income tax of $71,647.44, and for the year 1951, a net taxable income of $373,851.12, which, after the allowance of $1,000 as a standard deduction, resulted in a deficiency in income tax for that year of $286,918. He also determined that the petitioners were liable for additions to tax under section 294 of the 1939 Code for failure to file income tax returns for the said years. By amended answer, it is now the claim of respondent that the net taxable income from the Charco Redondo mine operations for 1950 was $318,901.80 and the net taxable income from sugar cane production was $9,517.77, the total net taxable income being $328,419.57, and the deficiency in income tax for that year $223,807.64. The net taxable income as so claimed for 1950 is after the allowance of a credit of 20 per cent, which, under section 116(a)(3), supra, is to be considered as earned income. It is the respondent's further claim, by amended answer, *297 that the deficiency for each of the years 1950 and 1951 was due in part to fraud with intent to evade tax, and that additions to tax for fraud properly result. No books of account covering either the mining or sugar cane producing operations were made available to the respondent or his agent or agents, and no such books were produced at the trial herein or for the purposes of the trial. The respondent's determination was made from such records and data as were made available to or were discovered by his agents, both with respect to the Charco Redondo mining operation and the production of sugar cane. With respect to the gross sales of ore from Charco Redondo during the year 1950, there is no dispute. The parties are agreed that total sales of ore for that year were in the amount of $1,206,004.04, and the proof is definite and clear as to the receipts from the original and successor court administrators from Charco Redondo for 1951. The amounts so received are shown in our findings of fact. The parties are not agreed, however, as to the costs of ore sales during 1950, or as to other deductible expenses, the contention of the petitioners being that the costs and expenses exceeded *298 sales proceeds in that year, resulting in a loss, and the respondent contending that the net taxable mining income for the year was $318,901.80, as stated above. Whatever the final fate of the books kept by Saumell in respect of the mining of the ore at Charco Redondo up to the loading of the ore at Santa Rita for shipment to Santiago, the record is definite to the effect that at the beginning of the receivership those books of account passed into the hands of the administrator. We think it patent, however, that the net profits from the ore sales could not have been fully determined from the books kept at the mine, even if they had been available. We are satisfied that they contained no correct data or information, if any, with respect to the proceeds of sales, or of the costs or expenses after the ore was loaded on the cars at Santa Rita for shipment to Santiago, and as will be indicated hereafter, it may well be that the books did not correctly reflect the mining expenses up to the point of shipment of the ore to Santiago. As showing that the ore sales did not produce a profit in 1950, the petitioner strongly relies on daily sheets prepared by Saumell for him, purporting to show *299 the costs of producing the ore at the mine and of delivering it to Santiago. As reflected by these sheets, it is petitioner's contention that actual cost of production and delivery of the ore to Santiago for 1950 was at a mean average of $20.90 per ton, which costs did not reflect percentage depletion or depreciation, or the "cost for material purchases, or the purchase of machinery and equipment." That Saumell did prepare and transmit to Leeder sheets which on their face purported to show the daily costs of the production of ore at Charco Redondo and its shipment to Santiago, was acknowledged by Saumell in his testimony. The daily sheets for 1950 were not produced. It is the contention of the petitioner, however, that the per ton costs in 1950 were slightly more than for 1949, and petitioner did produce in support of his contention such sheets for 215 working days between January 1 and October 16, in 1949. Just why the 1950 sheets were not produced, leaving petitioner to place his reliance on the sheets for 215 working days of 1949, is not readily apparent of record. It was Leeder's testimony that he had turned the sheets over to his auditors, in the instant case. His counsel, at *300 a later time, stated of record that the auditors did not have them, and a further search would be made in Havana. Whatever happened thereafter, they were never produced. That they were not produced, however, is of no particular importance in resolving the facts herein. The parties apparently seem to be agreed that the costs for 1950 did not vary too greatly from the costs in 1949, it being the petitioner's claim that they were slightly higher in 1950 than they were in 1949, and it being the respondent's claim that they were slightly less in 1950 than they were in 1949, the basis for the respondent's position being that considerable flooding of the mine was shown for 1949, but not for 1950. In any event, we are convinced from the evidence that the daily sheets did not, and were never intended to reflect the costs of producing the ore from Charco Redondo and shipping it to Santiago. As shown in our findings of fact, entries with respect to certain items were made to reflect expenditures that were never made. The entries were made by Saumell at the direction of Leeder. When Saumell, on cross-examination, was taxed with the proposition that he had made false entries on sheets purporting *301 to show the daily costs of the production of ore, he quite convincingly explained that he made the entries at Leeder's instructions and he did so because otherwise he would have lost his job. In support of his contention that Leeder realized net taxable income from Charco Redondo in 1950 of $318,901.80, the respondent has made computations based on certain figures of record, or on computations made on the strength of certain evidence, which computations indicate a per ton cost for the production and sale of the ore, exclusive of allowances for depletion and depreciation, of $10.19, which is in contrast with a per ton cost of $20 to $21, as contended for by the petitioner. And while he has made an allowance for the freight cost of the ore to Santiago, his computation shows no allowance for other selling costs or costs of marketing the ore, other than the costs at the mine. It is to be noted also that respondent in arriving at the $318,901.80 figure for net taxable income has limited his production cost at Charco Redondo to only 50,174.19 tons, whereas, based on actual shipments of 55,588.95 tons of ore during the year, it could be persuasively argued, to say the least, that 1950 production *302 was in a comparable amount and that production costs computed on such tonnage would be more realistic. The petitioner, in addition to checks the proceeds of which were traceable to the bank account standing in the name of Cautillo Mining Company with Banco Continental Americano, and certain other checks drawn on his bank account with the Santiago Branch of the Bank of Nova Scotia, which checks the respondent has stipulated reflected costs of producing and selling the ore, produced numerous other canceled checks drawn on his Santiago bank account, in respect of which it was his testimony that they represented items of expense in connection with the mining operation. The respondent disputes the checks as being representative of expenditures in the mining operations. One or more of these checks were drawn in the name of Cautillo Mining Company, and though not traceable to the Banco Continental Americano bank account, could have reflected funds used in the mining operations. Seventeen checks, sixteen of which were drawn on petitioner's Santiago bank account and in the aggregate amount of $65,753.13, were drawn in favor of Cia Operadora de Muelles y Almacenes, S. A., which the respondent *303 at the trial herein admitted was a warehouse company operating warehouses in Santiago in which ore was generally stored. He has stipulated that one of the seventeen checks, in the amount of $2,041.77, dated April 28, 1950, was in payment of business expenses connected with the production of ore from Charco Redondo. He makes no allowance with respect to the other checks, none of which were taken into account in computing the cost of the ore as now contended for. To what extent petitioner was or was not reimbursed by the ore purchasers for the storage charges represented by these checks, we are not advised. We do know that a goodly part of the ore sales were made f.o.b. Norfolk and Baltimore. Various of the canceled checks representing payments made directly from petitioner's Santiago bank account, the proceeds of which did not pass through the hands of Saumell, were, according to the testimony of petitioner, in payment of repairs of machinery and equipment. Numerous others, however, were said to be in payment for equipment purchased for the mine, which would not represent deductible expenditures. One of the payments made to a chemical company he admitted had no connection with the mine, *304 but could have been for his "personal benefit" in the purchase of fertilizer for his sugar cane producing operations. Some of the checks to insurance companies were admitted to have been made in connection with personal life insurance, and did not relate to the mining operation. And from Leeder's own testimony, it could be that a substantial amount reflected by the checks represented attorney's fees paid for personal services in the defense of his title to Charco Redondo, and were not deductible. From the evidence, we are satisfied that the cost per ton for producing and selling the ore from the Charco Redondo mine in 1950 was in some amount between that contended for by the respondent and the amount contended for by the petitioner. We are convinced that the petitioner did make a profit on the production and sale of ore in 1950 in a substantial amount. Some indication is to be found in the results of the operations at the mine during 1951. It is noteworthy, we think, that for the first two months of the receivership the mining operation was not by a lessee on a fixed royalty, but by direct operation under the administrator and at a profit of approximately $114,000. There is no suggestion *305 or claim that the operation of the mine by the lessee thereafter was at a loss, and yet the facts show that from the two administrators petitioner in 1951 received $277,887.62, represented as 50 per cent of the total amount of profits and royalties paid out to him and Cajigas, S. A. in that year. It is definitely established that the production of ore in 1951 was at a greatly increased rate over that of 1950, and it could be that such an operation was much more efficient than that carried on under the supervision of Saumell and Deschapelles, with the result that the cost of production per ton of ore was substantially less than had been the case in 1950. It is not possible on the record before us to compute or determine with any degree of accuracy or certainty the amount of the profits actually realized by Leeder in 1950. The respondent, in determining the deficiency herein and as shown by the notice of deficiency, determined that petitioner's net taxable income for 1950 was $137,585.43. The burden of showing that the profits realized was in a lesser amount was on the petitioner. With respect to the remainder of the $318,901.80, claimed for the first time by the respondent by amended *306 answer, the burden of proof rests on respondent. On the record before us, it is our conclusion and we hold that the petitioner in 1950 realized from the mining and sale of manganese ore and from sugar cane a net profit of at least $137,585.43, as the respondent has determined, and that he has not borne his burden of showing a lesser realization of net taxable income for that year. Similarly, we are unable to say that the respondent by his proof has shown that the profits realized were greater than shown in his determination. In determining the deficiency for 1951, the respondent has determined that petitioner had net taxable income of $373,851.12. Based on the evidence, we have found that in 1951, $277,887.62 was received by Leeder from or was made available to him by the two administrators, who under court order had charge of Charco Redondo. As expense charges against such income, effect is to be given under Rule 50 computations to the amounts represented by certain canceled checks which according to stipulation were in payment of expenses in the production of ore. Also, we are persuaded that two other checks on petitioner's Santiago bank account for $1,000 each, dated July 1 *307 and September 12 of 1951, issued in the name of Cautillo Mining Company and endorsed by "Luis Deschapelles, Pres.," and "D. Saumell, Vice Pres.-Treas.," represented deductible costs, and we so hold. Allowance should also be made for the $2,000 taken from the mine safe by Saumell in January of 1951 and retained by him for the payment of salaries to himself and other employees. With respect to income from the production of sugar cane, it is the contention of the petitioners that the cane growing operation was that of Matanzas Land & Trust Company, a Cuban corporation, and that they realized no income therefrom. Aside from some references to the character of Cuban corporations as being entities separate and apart from the stockholders, the only finding of fact requested by petitioner with respect to the sugar cane operation is that "the Matanzas Land & Trust Company, for which income for sugar cane operations is claimed, was a validly formed corporation under the laws of Cuba organized December 27, 1945." In argument on brief, it is stated that the corporation was created on December 27, 1945; that the chief stockholder was Leeder's father, R. H. Leeder; that of approximately $20,000 *308 of the outstanding stock of the corporation, Leeder or his wife had a $600 investment; that the corporation took title to all lands involved in the sugar cane operations; that no salaries were paid to Leeder in either 1950 or 1951 by the corporation, and no dividends were declared by it. Actually, the petitioners' case on this issue amounts to little if anything more than the statement of their contention. Subject to the condition that a translation from the Spanish to English be supplied, a document was offered by petitioner and identified by Leonardo Gonzales, a Cuban lawyer and the court interpreter herein, as purporting to be a copy of the charter and by-laws of the Matanzas Land & Trust Company, a Cuban corporation. No translation of the document into English has ever been submitted, and its physical condition is such that in great, if not in major, part, it is not even legible in Spanish. No books or records were produced and there is no showing or proof that the corporation, if a corporation did exist, did in fact operate, or that it did or did not produce sugar cane. On the other hand, there is evidence of record which to our satisfaction shows that Leeder personally was *309 engaged in sugar cane producing operations. He admitted as much to the special agent in early interviews had with him. And in the course of his testimony directed to the mining operations, he testified that a check for $1,916.07, dated September 1, 1950, on his Santiago bank account, in favor of the American Agricultural Chemical Company, was not in connection with the mining operations, but may have been for his "personal benefit" in the purchase of fertilizer for the farm, which was further identified as the sugar cane growing operation. In his 1952 return, he reported $16,152.61 as his profit from sugar cane. There is also evidence that in 1950, and as a sugar cane planter, he individually delivered to a cane grinding facility 1,095,244 arrobas of sugar cane, receiving in settlement therefor $92,288.23. In 1951, as a sugar cane planter, he similarly delivered 1,254,471 arrobas of sugar cane, receiving $100,851.63 in settlement. And in 1952, when his reported profit, as above indicated, was $16,152.61, the amount received in settlement for 1,630,683 arrobas of sugar cane delivered for grinding was $112,127.29. As with respect to the mining operation, we are satisfied that Leeder *310 in both 1950 and 1951 was engaged in the growing of sugar cane for his own account, and that in both years he realized taxable income thereon. With respect to 1950, the record shows that income from sugar cane was included in the net taxable income determined by the respondent in his determination of deficiency, and in respect of which the petitioners have not borne their burden of showing a lesser amount. For 1951, however, the facts show that Leeder's total receipts from the Charco Redondo mining operation was only $277,887.62, as compared with a determination by the respondent of a total net taxable income of $373,851.12. As indicated, the evidence supports a finding that Leeder in 1951, and in addition to income from the Charco Redondo mine, was also the recipient of income from sugar cane growing operations, and the evidence, we think, supports a finding that those profits were at least as much as $11,591.46, as shown in our findings of fact, this amount being in the same proportion to 1951 sugar cane receipts as the 1952 sugar cane profits were to total receipts from sugar cane in that year. See Cohan v. Commissioner, 39 F. 2d 540. The respondent has claimed, *311 and in our findings of fact we have found that the deficiency in income tax, or a part of the deficiency, for each of the taxable years 1950 and 1951 was due to fraud with intent to evade tax. The evidence shows that during the taxable years and for many years prior thereto, the petitioners, although citizens of the United States, had resided continuously in Cuba; that petitioner Marsden R. Leeder was a practicing lawyer in Havana, and was familiar with the United States income tax laws, to the effect that in the case of an individual citizen, a bona fide resident of a foreign country during the entire taxable year, earned income received from sources without the United States was exempt from the income tax, but that other income, such as the income from business operations and from property, was subject to tax and that the law required that it be reported. The evidence further shows, however, that although possessing such knowledge, he had for many years been engaged in business and property transactions, including the business of mining and selling manganese and chrome ore, it was only after a jeopardy assessment or assessments had been made following the seizure at the Havana airport *312 of the American currency he was attempting to bring out of Cuba that he ever made a return reporting income flowing to him from the ownership of his mining properties, and even then he limited his reporting of income to the year 1952 and to gain realized on the sale of his interest in Charco Redondo, and related properties. In fact, he admitted to the special agent that he had never filed a United States income tax return for any prior year except 1949, and in that instance the only item of income shown by the return was gain on the sale of real estate located in the United States, namely, a residence in Miami Beach, Florida. In that return, he made no report or mention of his mining and sugar cane growing operations, the only intimation of possible income from any other source being the listing of his occupation as attorney at law and the statement that he was a practicing attorney "a resident of Havana, Cuba, for approximately 25 years," and income from which he was fully aware was not subject to United States income tax. Leeder had, of course, sold both his manganese ore and his chrome ore to buyers in the United States, but by use of the name Cautillo Mining Company, such sales *313 were masked to make it appear that a Cuban corporation, not Leeder, was the producer and shipper of the ore. In keeping with the practice of having the ore storage warehouse receipts issued in the name of Cautillo Mining Company, the waybills, bills of lading and invoices covering the shipping and selling of the ore to the buyers in the United States listed the shipper of the ore as Cautillo Mining Company. In explanation of the handling of the ore sales receipts which were paid by the purchasers to Leeder in his own name, Leeder advised the special agent for the Internal Revenue Service that he was acting under a power of attorney. It is to be noted also that even after the publication of the currency seizure in Havana, and his admission of the realization of some gain on the sale of his interest in Charco Redondo to an accountant who had been employed by him, and after the making of the 1952 return, Leeder still not only made no move or effort to report his income from his mining operations for any prior year, but persisted in the contention that the mining operation and sale of the ore was not his operation but that of a Cuban corporation, when, in fact, as he well knew, the mine *314 was being operated and the ore was being sold by and for himself. And with respect to the reporting of gain on the sale of his interest in Charco Redondo, his attitude as reflected to the accountant was that even though he would like to retain his American citizenship, if the Government assessed him with a tax which he didn't "feel" he owed, he would just stay in Cuba. With respect to the mining operations for prior years, he advised the special agent that he would like to remain an American citizen, with the freedom of coming and going, and to that end, would be willing to pay any "reasonable" tax that might be due. Not only has there been no effort on Leeder's part to assist in the determination of his correct tax, but he has persisted with intentional misrepresentations of the mining operations, and with respect to his sugar cane growing operations, advised the special agent that he ran "a one-man show" and didn't believe he had "to account to or keep records to account to anyone." On the evidence of record, it is our conclusion that the deficiency in income tax, or a part thereof, for each of the taxable years 1950 and 1951 was due to fraud with intent to evade tax, and we so *315 hold. The respondent also determined additions to tax for both 1950 and 1951, under section 291(a) of the 1939 Code, for failure to file returns for the said years, and under section 294(d)(1)(A), for failure to make a declaration of estimated tax. By amended answer, he has claimed that the petitioners are also liable for an addition to tax for the said years, under section 294(d)(2), for substantial underestimate of estimated tax. The facts show that the petitioners have not filed either income tax returns or estimates of income tax for the said years, as required by the statute, and it is our opinion that what we have said above with respect to the addition to tax for fraud indicates a proper and adequate basis for the respondent's determination under section 291(a) and section 294(d)(1)(A). With respect, however, to an addition to tax for such years under section 294(d)(2), the respondent's claim must be rejected. Commissioner v. Acker, 361 U.S. 87. Decision will be entered under Rule 50. Footnotes
1. The document of incorporation which had been executed on February 12, 1945, by Gutierrez and Saumell, made no mention of the Charco Redondo mine, the recitals in the above minutes being the earliest dated mention of record of the Cautillo Mining Company in connection with the Charco Redondo mine, and except for the statements in a purported contract bearing date of December 30, 1946, covered hereafter, there is no showing of record of any instrument of grant or lease whereby or whereunder Cautillo acquired any rights in or to petitioner's Charco Redondo denouncement.↩
2. On December 9, 1955, Sandrino certified before a notary public that at a stockholders' meeting on January 9, 1947, a modified contract between Deschapelles, as president of Cautillo Mining Company, and Leeder, in his own right, was acknowledged and approved, which contract as so certified by Sandrino recited that by private contract executed February 15, 1945, Leeder, as sole owner and possessor of the managanese mine Charco Redondo, contracted with Cautillo for the exploitation of the mine; that Cautillo should continue as theretofore to mine manganese mineral from Charco Redondo and to remit the same to Santiago, or any other port or place, at the free disposition of Leeder; that Leeder would advance Cautillo, as theretofore, amounts necessary for payment of payroll, materials and machinery, and would pay railroad freight from Santa Rita to Santiago, or any other port or place, as well as marine freight and insurance; that at the end of December of every year thereafter, a liquidation of accounts would be made, with Leeder taking a maximum of $2 and remitting the balance to Cautillo as profits during the year, but if the amount representing the value of the mineral sold was not sufficient to cover "the $2.00 royalty" to Leeder, Leeder should collect "whatever amount results to a minimum of $1.00 per ton," and if "the same" was not sufficient to cover the $1, the difference resulting would be charged to Cautillo, to be paid the following year; that advances by Leeder to Cautillo and royalties unpaid should not bear interest, and that the term of the contract would be five years, to be extended from year to year at the request of Cautillo, unless thirty days' notice of termination should be given by Leeder. As shown by Sandrino's certification, the signatories to the contract were Cautillo Mining Company and Dr. Robert Marsden Leeder.↩
3. When Saumell made some inquiry about this $2 inclusion, Leeder advised him to follow instructions. On some occasion or occasions, he did make a reference to handling costs at Santiago. As will appear in the facts hereafter, the storage and loading costs on at least 38,002.48 of the 52,256.19 tons of ore sold in 1950 were paid not by Leeder, but by the purchasers. And there is no indication or showing that any unloading expense from the railroad cars was incurred separate and apart from warehousing costs. The shipments of ore in substantial if not most part were made by gondolas. The extent to which these cars were or were not constructed for mechanical unloading is not shown.↩
4. Charges of $119,058.55 for the transportation of the 55,588.95 wet tons of ore from Charco Redondo would represent a cost of $2.14 per wet ton. It thus appears that if the freight on the ore purchased from Caparros be included, the average freight cost per wet ton for all ore shipped to Santiago was something less than $2.14. The total amount of ore purchased from Caparros in 1950 is not shown and certain data purportedly covering some of the shipments of Caparros ore which are of record not only cannot be reconciled with the total charges of freight incurred by Leeder in 1950, but cannot be reconciled as between various shipments of Caparros ore. On exhibit, purporting to cover eight shipments of Caparros ore from Baire, which is considerably closer to Santiago than Santa Rita, for the period from March 29, 1950, to May 6, 1950, inclusive, shows a range of freight cost per wet ton of ore as between shipments from a low of $2.67, for March 30, April 22 and May 6, to rates of $2.81 for March 31, $2.86 for March 29, and $2.96 for the shipment of April 8. We do know that in 1949 petitioner incurred $89,858.01 for the transportation of ore to Santiago, but there is no showing of the amount of ore shipped. We know only that on 215 work days up to October 16, 1949, 25,528.88 wet tons of ore were produced at Charco Redondo, and that during 1949 petitioner sold from Santiago 34,873.38 wet tons of ore.↩
5. According to the 1948 Cuban income tax return, placed in evidence by the petitioners herein, the gross receipts for that year were $315,791.43, costs of operations were $156,677.96, total deductible expenses were $158,995.18, leaving as taxable net income $118.29. No returns were produced for the years 1949, 1950, or 1951, and there is no showing of the amounts reported as gross receipts on the Cuban returns for those years.↩
6. It was Deschapelles' testimony that at the time he signed the minute book the minutes of the purported meeting had not been inserted but that the page was blank.↩
7. The evidence is definite and clear that checks for $65,000 and $56,750 were delivered to Leeder for the period Manrique was judicial administrator, and it seems equally clear that checks in the same amounts were delivered to the Cajigas interests. If so, the total of the four checks, $243,500, cannot be reconciled with total profits of $239,371.45, as reported by Manrique for the entire period of his administration.↩
8. It was the testimony of Deschapelles that during the receivership the funds necessary to pay his workmen in Tunnel K-10 were supplied, but that during that period he received no payments as contractor for the said tunnel.↩
9. The last ledger sheet of record relating to the account was for the month of November 1950, and the balance shown was $48.76.↩
10. Unlike the preceding checks, there is no agreement or stipulation between the parties as to the disposition of the proceeds of these checks. It was the testimony of petitioner that the proceeds were expended in the Charco Redondo mining operation. ↩
11. It was the testimony of petitioner that the proceeds of these checks were expended in connection with the mining operation at Charco Redondo.↩
12. Respondent has stipulated that one of the checks, namely, Check No. 563, dated April 28, 1950, and in the amount of $2,041.77, was in payment of business expenses connected with the production of ore from Charco Redondo. There is no such concession or agreement with respect to the remaining fifteen checks.↩
13. It was the testimony of petitioner that Causo and Martinez, Inc., were steamship brokers and that the payments to them were "undoubtedly * * * for freight on ores," or "undoubtedly final liquidation of some freight or brokerage, loading or unloading."↩
14. Although the total of the payments made and provided for as per the written instrument was $560,000, the total of prices of the items as listed was $555,000.↩
15. The respondent, on brief, has computed allowable depreciation on the electric plant and the machinery for each of the years 1950 and 1951 at 10 per cent, or $12,820 per year; on the houses and buildings, at 3 per cent, or $4,500 per year; and on trucks, accessories and equipment, at 25 per cent, or $12,500 per year.↩
16. SEC. 116. EXCLUSIONS FROM GROSS INCOME. In addition to the items specified in section 22(b), the following items shall not be included in gross income and shall be exempt from taxation under this chapter: (a) Earned Income from Sources Without the United States. - (1) Foreign Resident for Entire Taxable Year. - In the case of an individual citizen of the United States, who * * * is a bona fide resident of a foreign country or countries during the entire taxable year, amounts received from sources without the United States * * * if such amounts constitute earned income as defined in paragraph (3); * * *
(3) Definition of Earned Income. - For the purposes of this subsection, "earned income" means wages, salaries, professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income producing factors, under regulations prescribed by the Commissioner with the approval of the Secretary, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 20 per centum of his share of the net profits of such trade or business, shall be considered as earned income.↩